# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

     Plaintiff,

     v.                                  Case No. 04-CR-235

STEVEN J. PARR,

     Defendant.

---

# RECOMMENDATION TO UNITED STATES
# DISTRICT JUDGE WILLIAM C. GRIESBACH

---

## NATURE OF THE CASE

On September 29, 2004, United States Magistrate Judge James R. Sickel issued a criminal complaint against the defendant, Steven J. Parr. Thereafter, on October 5, 2004, a federal grand jury sitting in this district returned a one-count indictment against the defendant, charging him with a violation of 18 U.S.C. § 2332(a).

On October 13, 2004, the defendant appeared before United States Magistrate Judge Sickel for arraignment, entering a plea of not guilty. Pursuant to the pretrial scheduling order issued at that time, the defendant has filed several motions, some of which have been resolved by this court. The following motions filed by the defendant are currently pending: 1) motion to suppress statements (Docket #50); 2) motion to suppress physical evidence (Docket #51); and 3) motion to exclude Rule 404(b) evidence (Docket #78). The motions to suppress will be addressed herein. The motion to exclude Rule 404(b) evidence will be addressed in a separate decision.

**MOTIONS TO SUPPRESS**

The defendant seeks to suppress statements he made to FBI agents while he was in custody in the Rock County Jail, asserting that the interview was the culmination of his illegal detention by state officials. The defendant also has moved to suppress evidence obtained from a July 18, 2001, search of his residence at 1121 Milton Avenue in Janesville, Wisconsin. The defendant asserts that the seizure of certain items, namely the "The Anarchist Cookbook" and a notebook which contained chemical formulas, exceeded the scope of the search authorized by the warrant. He also seeks to suppress various written items that were in his possession at the Oshkosh Correctional Institution and which were seized and copied by officers and subsequently returned to him. The defendant challenges the searches at 603 South Main Street, Janesville, Wisconsin, and 1234 Marquette Street, Janesville, Wisconsin, asserting that there was no lawful third party consent for such searches. The government opposes the defendant's motions.

On April 13, 2005, the court conducted an evidentiary hearing on the defendant's motions to suppress. The hearing was continued on April 26, 2005. The following persons testified at the hearing on behalf of the government: Wisconsin Department of Corrections (DOC) Supervisor Mary Margaret Lee; Shift Captain Richard Phillips, Oshkosh Correctional Institution (OCI); and Special Agents Michael Sheen and Robert Molina of the Federal Bureau of Investigation (FBI). Testifying of behalf of the defendant were Linda Williamson, David Parr and FBI Special Agent Ronald Hammen. Based on the testimony presented at the hearing, the court now makes the following findings of fact.

## Findings of Fact

### Oshkosh Correctional Institution

Defendant Steven Parr was released from the Oshkosh Correctional Institution (OCI) on parole supervision on September 21, 2004. The defendant was to have been released to go to the Rock Valley Community Program, which is a halfway house located in Janesville, Wisconsin. At that time, the defendant's probation and parole agent was Mark Peterson, who was supervised by Mary Margaret Lee, corrections field supervisor for the Wisconsin Department of Corrections (DOC), Division of Community Corrections.

On Wednesday, September 22, 2004, the defendant was placed in custody at the Rock County Jail. Ms. Lee and her supervisor, Assistant Chief Marie Finley, made the decision to transfer the defendant from the halfway house in Janesville to confinement at the Rock County Jail. When the decision was made to detain the defendant, an Order to Detain was generated which authorized the Rock County Jail to hold the defendant in custody for the Department of Corrections

The decision to place the defendant at the Rock County Jail was based on various sources of information, including information received from the Federal Bureau of Investigation (FBI) about the defendant threatening to blow up federal buildings, his criminal history which included violence, his drug cases and weapons offenses, the tattoo on his arm that looked somewhat like a bomb and had the word, "UNI," and confidential information that had been received from OCI. In addition, President George W. Bush was going to be visiting the area later that week. All of those factors led the state decision-making team to the conclusion that for the safety of the community and protection of the public the defendant needed to be detained to prevent potential violations.

-3-

No federal authority told the state officials that they had to make the decision to incarcerate the defendant. Although state officials previously were aware of some of the information, Ms. Lee received new information from the FBI which, coupled with the information already in the possession of state officials, lead them to the decision to take the defendant into custody. According to Ms. Lee, the incentive to take the defendant into custody came directly from the FBI at their request.

The alleged threats made by the defendant took place while he was doing his initial confinement and not while he was on extended supervision, so he would not have been revoked for those statements. However, since the statements made were about something that the defendant allegedly was going to do after his release, Ms. Lee explained that that would have to be weighed.

Ms. Lee explained that when a person is on probation or parole supervision, the Wisconsin Administrative Code gives state officials authority to hold the person in custody and to detain him or her for various reasons. The agency may authorize detention initially for up to three working days. An additional extension for three days would require the approval of a supervisor. After that time, the regional chief can approve an additional extension for five working days. Working days do not include Saturdays, Sundays or legal holidays.

The initial three day detention of the defendant expired at the close of business on Friday, September 24, 2004. No extension was signed until after the expiration of the initial three-day period. However, by Friday, September 24, 2004, Ms. Lee "would have had a discussion with [her] supervisor to hold [the defendant] an additional three days. (Tr. 24). On Monday, September 27, 2004, Ms. Lee signed an order extending the detention of the defendant for an additional three days through September 29, 2004. An order for detention

-4-

needed to be signed on Monday in order to hold the defendant for an additional three days. Extensions are normally signed either on the third day or the beginning of the fourth day.

If an order of detention had not been signed on Monday, the authority of the Department of Corrections would have run out and the defendant could have been released. However, in order to release an offender, the department would have to generate a separate document which would be a cancellation of the Order to Detain. The extension form Ms. Lee signed authorized the defendant's detention from September 22 to September 29, 2004. (Exhibit 101).

Ms. Lee could not say for sure why she did not sign an extension at the end of the day on Friday. It could have been a geographical issue, namely that she was not in a place where she could personally sign the paperwork. At one time, in computing the time period of an extension, the day following the day the person was placed in custody was counted as day one. However, an administrative directive was issued that staff needed to begin counting the day the person was placed in custody. Ms. Lee could not recall whether that directive came before or after September of 2004, although it was right about that time. The directive clarified that staff should start counting on the day the person was taken into custody.

Richard W. Phillips is employed as the First Shift Relief Captain at OCI. As a shift captain, his duties are to oversee the shift and make sure that the employees get to their posts and to their other management duties.

When an inmate arrives at the institution, he is provided an inmate handbook so that he knows the layout of the institution and its rules and procedures. Each inmate also receives an inmate property handbook which explains the rules regarding what property inmates can possess. The defendant signed his receipt of the inmate handbook on July 25, 2003.

-5-

The inmates also receive a copy of the inmate property handbook which gives information about the rules regarding their property. Property limitations vary from institution to institution depending upon the security classification of the institution and the type of property permitted. The Department of Corrections has different types of security classifications within its various institutions, namely maximum, medium and minimum security. Oshkosh Correctional Institution is a medium security facility which has approximately 93 acres of land inside the fence. The institution generally houses between 2,000 and 2,050 inmates and the inmate housing units are designated by letter. The defendant lived in U Building.

Oshkosh Correctional Institution has a property room. Once inmates come into OCI, all their property goes to the property room. Staff goes through the property looking for any contraband items or anything that is not allowed at OCI. After the staff has gone through the property, they will call the inmates to come and get their property. An inmate cannot go to the property room and take his property back to his cell without staff approval. Inmates are permitted their own property in their cells.

The defendant entered the Wisconsin prison system on May 20, 2003, at the Dodge Correctional Institution. His security status was determined to be medium security on July 7, 2003, and, therefore, he was transferred to OCI on July 25, 2003. He was released from OCI on September 21, 2004, according to OCI records.

As a resident of cell block "U" the defendant shared a cell with another inmate. Inmates in that cell block are subject to random, unannounced searches consistent with OCI's policies and procedures manual. The staff at OCI is required to do at least three cell

-6-

searches per day, per shift. Inmates are also subject to random searches of their person. The only restriction on cell searches is the reading of legal material.

Oshkosh Correctional Institution conducts anger management sessions which are designed to help inmates address anger issues, and if an inmate brings work materials to his cell from an anger management class, institution staff would be permitted to read such materials. Information discussed is subject to limited confidentiality. Information which might be considered a crime or a potential violation of the law is not deemed to be confidential. Treatment records of an inmate are confidential, but may be accessed by others when the inmate authorizes the disclosure, a judge issues a court order for such information or state statutes provide for such disclosure.

When an inmate leaves the institution, he places his property in a cart and brings it to the property room. The property is checked and then given to the inmate. When an inmate is released on extended supervision, the staff in the property room prepares a detailed inventory sheet of the property so officials know what property an inmate is taking with him. Completing the inventory sheet requires OCI staff to search through the property to determine if it contains any contraband. Any contraband that is found is documented. After the property inventory sheet is completed and signed by the inmate and the attending staff member, the property is generally boxed. The search of an inmate's property at checkout has three main focuses: the safety and security of staff, inmates and the public. The defendant's property inventory sheet generated on September 20, 2004, is marked government's Exhibit #12. There is no evidence that any contraband was found during the checkout process of the defendant's property.

-7-

On September 20, 2004, Captain Phillips met with FBI Special Agents Ron Hammen and Patrick Lynch in a conference room at OCI. At that time, Agent Hammen knew that the defendant would be released on September 21, 2004, to reside in a halfway house in Janesville, Wisconsin. The agents wanted to know the circumstances of the defendant's departure from OCI and the time he was leaving. They explained to Captain Phillips that they had some information that the defendant wanted to blow up a federal building in Milwaukee and they wanted to see if there was anything in the defendant's property, such as a plan or other documentation, that might be relevant to their investigation. Special Agent Hammen previously had made arrangements with Captain Derringer at OCI to examine the defendant's belongings. Captain Derringer agreed to provide the items to Special Agent Hammen.

As of September 20, 2005, Special Agent Hammen knew that the FBI had received two letters from the defendant's cell mate, alleging that the defendant had knowledge of chemicals and bomb making and planned to bomb a federal building. He was also aware of the results of Special Agent Molina's interview of the defendant's cell mate, the defendant's criminal history, police reports from the Janesville Police Department and the items recovered during a search conducted when the defendant was arrested in July of 2003. During the execution of the search warrant, officers recovered chemical formulations, as well as drug-related items.

The agents asked to go through the defendant's property so Captain Phillips took them to the property room. Captain Phillips directed Sergeant Kokke, who was with them, to open the box and to search through the property to see if there was anything relative to the agents' investigation. Both OCI sergeants went through the items in the defendant's box. When they found something that they thought might have relevance to the FBI's investigation, they

-8-

gave it to the agents to check. One of the officers saw a stack of papers and gave it to the FBI agents. The agents went through the papers and pulled out some items. Captain Phillips did not have any discussion with the agents about procedures for searches of inmate property.

Captain Phillips permitted the FBI agents to view and copy material from the defendant's personal property. The agents were looking for information that might be pertinent to their investigation and would provide an indication as to whether the defendant was intending to bomb the federal building or was capable of doing so. When they went to OCI on September 20, 2004, the agents did not know whether or not the defendant was enrolled in any rehabilitation or anger management program at the institution.

The agents made copies of certain documents, including pages from the defendant's address book and envelopes which are listed in Exhibit #7. They also made copies of portions of a workbook or pamphlet which appeared to have been completed in response to some assignment the defendant was given in a treatment program. Neither the pamphlet nor the papers were stamped "confidential" or designated as treatment records. Agent Hammen took these documents because they were authored by the defendant and he felt they might be pertinent to his investigation. Upon occasion, OCI staff works with law enforcement officers on investigations which includes allowing enforcement officers to come to the property room to view potential evidence.

Special Agent Hammen did not direct the DOC to take the defendant into custody, nor did he tell the community corrections' personnel that he wanted them to hold the defendant in custody. However, he did provide information that the DOC might find useful in taking the defendant into custody. Special Agent Hammen also discussed his concerns with probation

-9-

and parole personnel, including asking whether they could take action to get the defendant into a more secure facility than the halfway house.

Agent Hammen obtained items from the Janesville Police Department during the course of his investigation. This included a copy of a book entitled the "Anarchist Cookbook." (Tr.160).

<u>Statement Obtained from the Defendant</u>

On September 29, 2004, Special Agent Hammen, along with Special Agent Molina, interviewed the defendant in an interview room at the Rock County Jail. At that time, the defendant was being held by the DOC. Agent Hammen arrested the defendant pursuant to a federal arrest warrant (Exh. 1), which he showed to the defendant. Exhibit 2 is a copy of the criminal complaint issued on September 29, 2004, along with the arrest warrant. Only the two agents and the defendant were present during the interview.

At the commencement of the interview, the agents identified themselves, explained that they were there to talk about an alleged plan to bomb the federal building and that they had a warrant for the defendant's arrest. Agent Hammen read the defendant his <u>Miranda</u> rights[1] and went over each of the rights to make sure the defendant understood them. The defendant then signed the waiver of rights form and gave a statement to the officers.

At no time during the interview did the defendant ask for a lawyer. No threats, verbal or physical, or promises were made to the defendant. The agents conducted the interview, which lasted approximately two hours, in a conversational tone. During the interview, the defendant was offered lunch, but only accepted an apple. According to Agent Hammen, the

_____

[1]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

-10-

defendant appeared willing to discuss the matter and did not appear intoxicated or impaired in any way. After the interview, the interview was transported to federal court in Green Bay for his initial appearance on the criminal complaint.

Interview of Linda Williamson and Items Obtained

On September 28, 2004, FBI Special Agents Michael Sheen and Jean LaPlace interviewed Linda Williamson, the defendant's ex-girlfriend, at her home in Janesville, Wisconsin. The purpose of the interview was to obtain information about the defendant and to determine whether there was any indication that the defendant had used any kind of chemicals or had been involved in explosions in the past.

Ms. Williamson had met the defendant through a mutual friend. The defendant began to live with Ms. Williamson and her sons at her home in July 2001, until he went to an alcohol and drug treatment center. He returned to live with Ms. Williamson until June 2003, when he went to prison. The defendant did not pay rent or any of the utilities. It was Ms. Williamson's expectation that the defendant would come back to live with her when he was released from prison. The defendant had no ownership interest in her residence.

When the defendant went to prison, he left his belongings with Ms. Williamson, including several duffel bags containing various items, as well as clothing, furniture, a box containing odds and ends and notebooks. She was storing these items for him. All the items were stored in her bedroom closet with the exception of the box containing some notebooks and the CD's. The defendant never told Ms. Williamson that she could not allow anyone to go through his belongings.

During the one-hour interview with the agents on September 28, 2004, Ms. Williamson indicated that in conversations and in her observations, she saw that the defendant had an

-11-

interest in chemistry and explosions. She also indicated that the defendant had a propensity for violence, although he was not violent with her. Ms. Williamson exhibited some animosity towards the defendant and was angry with his drug use and his connection with the criminal activity under investigation. She also mentioned that the defendant had been interested in bringing a gun into her house and that she did not want anything to do with the gun. Based on Special Agent Sheen's observations. the breakup of the relationship between Ms. Williamson and the defendant was not a happy event from Ms. Williamson's perspective. However, she had regularly visited him at the correctional institution.

Near the end of the interview, Ms. Williamson mentioned to the agents that the defendant left some of his belongings at her residence prior to going to prison, but that he never gave her instructions about what he wanted done with them. Prior to going to interview Ms. Williamson, the agents had no indication that the defendant stored any items in her home. The agents did not ask Ms. Williamson whether the defendant had left any items at her home. She voluntarily brought out some of the items which were in the living room where the agents were conducting the interview. Ms. Williamson retrieved other items from a back bedroom and gave the agents permission to look through all the items. She placed no limitations on the items the agents could view or on the items that they could take. Ms. Williamson told the agents to "take everything. Take it all." (Tr. 100).

Some items, including books and papers, were in bags while other books and papers were just in stacks. The agents looked through the items, selected certain ones to take with them and prepared an inventory of the items they took.

About three weeks after the first interview, Ms. Williamson called the FBI because she and her sons found a few more notebooks belonging to the defendant while they were

-12-

cleaning the defendant's items out of Ms. Williamson's closet. They asked the FBI to come and pick up the items. FBI agents never took anything from Ms. Williamson's residence without her permission. She was given a receipt for the items taken.

<u>Interview of David Parr and Items Obtained</u>

On September 28, 2004, FBI Special Agent Roberto Molina, along with Special Agent Steven Van Hoof, interviewed David Parr, the defendant's brother, at the Janesville School District's administrative building as part of the investigation to obtain background information about the defendant. During the course of the interview and in response to questions, Mr. Parr stated that he was storing items for the defendant. Mr. Parr told the agents that after a prior arrest of the defendant, he had helped clean out his residence and took approximately four horse trailer loads of the defendant's belongings that were at the residence to the dump. After the defendant's latest arrest, the defendant gave his brother items for storage. Mr. Parr understood that the items would be returned to his brother when he got out of prison. Mr. Parr had stored his brother's belongings on prior occasions.

When asked, Mr. Parr agreed to give the items to the agents. He thought there was a box containing a notebook and a book and notes from a chemistry class taken by the defendant. Mr. Parr was polite and cooperative during the interview. Agent Molina did not try to coerce Mr. Parr into giving his brother's items to the FBI. Agent Molina said he would contact Mr. Parr about making arrangements to pick up the items at Mr. Parr's home.

On the same day as FBI Agents Sheen and LaPlace interviewed Ms. Williamson, they also had planned to interview another individual who happened to live next door to David Parr. As the agents approached the individual's home, Mr. Parr drove up and flagged down the agents as they were going to his neighbor's house. Mr. Parr, who introduced himself as the

-13-

defendant's brother, thought the agent's were there to pick up some of his brother's items which were at Mr. Parr's home.

Initially, Agent Sheen did not know what items Mr. Parr was referring to, but he eventually determined that Mr. Parr previously had had a conversation with another FBI agent. During that earlier conversation, Mr. Parr had told that agent that he would turn over some of his brother's things to the FBI. Agent Sheen said he would take the items.

Special Agent Sheen went into Mr. Parr's home to retrieve the items. Mr. Parr was storing three boxes of goods belonging to his brother. Mr. Parr gave one box containing the defendant's items to Agent Sheet after removing some pornographic material. The box primarily contained books and other documents. Agent Sheen took everything that was in the box with the exception of the pornographic material and the picture of the defendant's son and related documents. Although the agents cursorily glanced at the remaining two boxes, they did not take items from those boxes. The boxes remained with Mr. Parr.

According to Mr. Parr, FBI agents had also stopped at his mother's house and searched the barn. Mr. Parr's mother advised him that the agents said they would get a warrant if she did not consent to a search of her premises. Mr. Parr did not want agents to execute a search warrant at his home.

### Search of Defendant's Residence on July 18, 2001

On July 18, 2001, a search warrant was obtained for the defendant's residence. The warrant was sought based on controlled buys and garbage searches at the defendant's residence, as well as his prior arrests for possession of controlled substances.

On July 21, 2001, Police Officer Brian Vaughn and other officers with the Janesville Police Department executed a search warrant at the defendant's residence. During the

-14-

course of the search, baggies of marijuana were found in a bedroom closet and a digital scale, documents and other amounts of suspected illegal substances were observed and seized. The "The Anarchist Cookbook" and a writing tablet containing written chemistry formulae also were seized from the residence. Officer Vaughn was familiar with "The Anarchist Cookbook" based on his police training and had also found this type of book during the execution of other search warrants. "The Anarchist Cookbook" and writing tablet were found by Sergeant Olson on a coffee table in the living room of the residence.

"The Anarchist Cookbook" contains directions on how to grow marijuana, how to make bombs and how to make LSD. It also contains sections about growing marijuana and has different recipes for the use and consumption of marijuana. There is nothing illegal about possessing "The Anarchist Cookbook."

According to Officer Vaughn, in executing drug search warrants, it is common to look inside books or multiple page documents because these are places where money and other documents can be hidden. Officer Vaughn also testified that books and other documents often provide evidence of who is living at a particular residence. Officer Vaughn had no specific recollection as to why "The Anarchist Cookbook" and writing tablet were seized.

Chemistry-type equipment, such as Bunsen burners, glass beakers and bottles of chemicals, were observed in the basement of the residence. They were dusty and looked like they had not been used recently. These items were not seized because the officers concluded that the equipment had not been, or was not going to be, used for manufacturing methamphetamine. According to an officer's report, none of these items was immediately recognizable as being illegal or harmful. After a check with the Wisconsin Department of Justice, Division of Narcotics Enforcement (DNE), the agents did not take the equipment

-15-

because "we did not believe that it had been used or was going to be used for methamphetamine particularly." (Tr. 206 [quoting Exh. 10]).

The report also stated that the chemistry-related books, "The Anarchist Cookbook" and the writing tablet with various chemical formulae were seized because the officer believed "that Steven Parr had the majority of the ingredients to make methamphetamines, however there wasn't an active lab or any finished product of methamphetamines discovered." (Tr. 212 [quoting Exh. 10]). At the hearing, Officer Vaughn took issue with the statement that "the majority of the ingredients to make methamphetamine" were discovered during the search. (Tr. 212). He opined that the officer writing the report "may have wanted to say majority of equipment." Id. No ingredients consistent with the production of methamphetamine were found during the search. (Tr. 213).

## ANALYSIS

Search at Oshkosh Correctional Institution: The defendant contends that the search and seizure at the Oshkosh Correctional Institution were unlawful because, under the circumstances, he had a protected expectation of privacy in the items and an added expectation of privacy in the seized documents relating to his participation in the anger management group. The defendant states that once his property cleared the security check at OCI and was boxed, sealed and stored in a storage rack pending his release the following day, he had a heightened expectation of privacy which prevented the search and seizure in this case. In the alternative, he maintains that the storage of his property at OCI established a bailment and that such bailment created a reasonable expectation that there would be no interference or tampering with his sealed box.

-16-

Specifically with respect to the anger management program documents, the defendant asserts that he signed a confidentiality agreement when he entered the program which, with rare exceptions, prevents disclosure of program documents. He also distinguishes Hudson v. Palmer, 468 U.S. 517 (1984), stating that the items at issue were not in his cell, but rather he had placed them in storage in anticipation of his release from prison the following day.

According to the government, the defendant had no reasonable expectation of privacy in the documents in the OCI property room which the FBI photocopied without a warrant. Relying on Hudson and other cases, the government states that a prisoner has no Fourth Amendment privacy right even within the contours of his prison cell and that officials may examine outgoing inmate mail and seize anti-government writings without implicating the Fourth Amendment. Additionally the government states that DOC regulations for OCI basically eliminate any privacy expectations that inmates may have in their person or property, citing Wis. Admin. Code, DOC §§ 306 and 309, as well as OCI publications.

The government points out that the defendant cites no authority for his assertion that his property in the property room should be evaluated differently because it was sealed and ready for him to obtain the following day upon his release. According to the government, the property was still on OCI premises and remained subject to DOC and OCI rules. It also notes that no witnesses established the defendant's participation in the anger management program and that those who did discuss the purported anger management materials lacked personal knowledge of the defendant's asserted participation in that program.

It is well settled that a prisoner does not have a reasonable expectation of privacy in his prison cell entitling him to the protection of the Fourth Amendment against unreasonable searches and seizures. Hudson v. Palmer 468 U.S. at 525-26. In Hudson, the Court

-17-

explained that the recognition of such privacy rights "simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Id. at 526. "We believe that is accepted by our society that '[l]oss of freedom of choice and privacy are inherent incidents of confinement.'" Id. at 528 (quoting Bell v. Wolfish. 441 U.S. 520, 537 [1979]).

DOC regulations in effect at OCI also basically eliminate any expectation of privacy that prisoners may have in their person and belongings on OCI grounds, with limited exceptions not relevant to the issue before the court. An OCI staff member may conduct a search of any area on the premises (Wis. Admin. Code DOC §306.14) and the warden may suspend or modify institution operations and authorize a search of OCI premises. (Wis. Admin. Code §306.15). Pursuant to Wis. Admin. Code §306.16(1), OCI staff may conduct of a search of the living quarters of any inmate at any time. See also, Exh. #14, "Oshkosh Correctional Institution Security Policies and Procedures Manual dated March 5, 2002, at 3. At OCI, staff assigned to individual living areas are "responsible for conducting a personal search of at least two inmates per shift per day." Id. Staff may also read "that part of the inmate's legal materials as necessary to determine that the item is legal material and does not contain contraband." (Wis. Admin. Code DOC § 306.16[5]).

Any OCI staff member may conduct a personal search of an inmate under specified circumstances, including when directed to do so by a supervisor, if the staff member has reasonable grounds to believe that the inmate possesses contraband, before and after a visit or as part of a periodic search or lockdown of a housing unit. (Wis. Admin. Code DOC §306.17[1][b][1],[2],[5]). DOC administrative regulations also authorize staff members to

-18-

conduct strip searches, body cavity and body content searches of inmates under certain conditions.  See Wis. Admin. Code §306.17(2)-(4).

An inmate's incoming and outgoing mail may be opened and inspected for contraband. (Wis. Admin. Code §309.04[4][a]).  OCI can regulate visitation of inmates by family members, friends and others, and the warden is authorized only to permit visitors who are on an inmate's approved visitors' list.   (Wis. Admin. Code §309.06, 309.08[1][a]).

The defendant argues that his belongings in the property room should be evaluated differently because the property was stored and sealed and would be provided to him upon his release the following day.   Alternatively, he argues that the storage of his property established a bailment.  The defendant cites no authority for these contentions, nor does he adequately explain why these circumstances call into question the Court's holding in Hudson about privacy rights of prisoners.

The defendant was a prisoner at a medium security institution which is governed by specific rules and regulations to ensure the safety of the inmates, staff and visitors.  Loss of privacy is an inherent part of prison confinement.  See Hudson, 468 U.S. at 528; Bell. 441 U.S. at 537.  The facts before the court show that the defendant's property was searched and inventoried by OCI staff when it came to the property room.  The defendant needed OCI authorization to have access to his property in the OCI property room.  The property room, which is on OCI premises, and all the property in it remain subject to OCI and DOC rules and regulations.   Therefore, the defendant's property which was temporarily stored in the OCI property room was subject to inspection.

The defendant's challenge to the seizure of his alleged homework notes from the anger management program also is without merit.   The defendant states that he signed a

-19-

confidentiality agreement when he entered the program and that the disclosure of the seized items is prohibited by that confidentiality agreement. Thus, the defendant maintains that he had a greater expectation of privacy in these materials.

According to evidence presented at the hearing, information provided to treatment staff has limited confidentiality. See Exh. #26, "Limits of Confidentiality Regarding Information Rendered to Treatment Staff; Tr. 82. However, treatment reports, notes and test results may be reviewed by authorized staff when they have a good reason. This includes the "Program Review Committee, warden, social worker, security and health services staff, parole board [and] parole & probation agents." (Exh. #26). Treatment providers are required to report any information that presents a threat to the inmate, the institution, community corrections operations and/or public safety to the appropriate authorities. Id.

At the hearing, Captain Phillips testified about the anger management program, although he had limited knowledge about the actual operation of the program. When they were at OCI, the FBI agents copied portions of a workbook or pamphlet which appeared to be in response to an assignment given to the defendant in a treatment program. However, no evidence was presented that any specific notes or writings photocopied and seized by the FBI from the defendant's belongings came from the prison's anger management program. Moreover, there is no indication that these notes and materials constituted information that fell within the parameters of the limited confidentiality set forth in Exhibit #26.

Further compounding the problem for the defendant, no witnesses testified that the defendant was an actual participant in the anger management program. The defendant did not testify at the hearing. Thus, the court lacks evidence to conclude that the defendant was a participant in the anger management program, that the materials seized from the

-20-

defendant's belongings were somehow part of that program and that those materials were entitled to limited confidentiality.

In sum, the defendant has not established that he had a reasonable expectation of privacy in the materials photocopied and seized by the FBI from the defendant's property at OCI. Accordingly, the court will recommend that the defendant's motion to suppress these items be denied.

Detention of the Defendant on September 22-29, 2004

The defendant maintains that he was unreasonably and unlawfully detained from September 22 to September 29, 2004, by DOC officials at the direction of the FBI. He points out that no warrant for his arrest or other lawful detention order existed prior to September 29, 2004. The defendant asserts that the extension authorized by the DOC supervisor on September 27, 2004, was too late and lacked lawful authority. Therefore, the defendant maintains that his retention in custody was illegal and that any statement or physical evidence obtained from such illegality must be suppressed.

In response, the government asserts that the defendant's custody in the Rock County Jail was legal and authorized by DOC regulations. Regardless, the government points out that the defendant would have remained in a halfway house in the custody of the State of Wisconsin if he had not been transferred to the Rock County Jail. The government maintains, contrary to the defendant's contentions, that the evidence shows that while the FBI agents hoped the state would place the defendant in a secure facility, the FBI's role was limited to providing information to the DOC. It did not take part in the state's decision-making process.

According to the testimony presented at the hearing, the defendant was released from OCI on parole supervision on September 21, 2004, and was to have been housed at a

-21-

halfway house in Janesville. However, Mary Margaret Lee, corrections field supervisor for the DOC and her supervisor, Assistant Chief Marie Finley, made the decision to transfer the defendant from the halfway house to the Rock County Jail. This decision was based on information received from the FBI regarding threats made by the defendant to blow up federal buildings, as well as the defendant's criminal history which included violence, and confidential information that had been received by OCI. The officials were also aware that President Bush was going to be visiting the area later in the week and there was concern for the safety of the community and the protection of the public.

The defendant was taken into custody on an initial department hold pursuant to which the defendant could be detained for up to three working days.[2] Wisconsin Administrative Code DOC §328.22(3) also authorized an extension for an additional three working days with the approval of a supervisor. The regulation does not indicate whether the paperwork must be signed within this three-day period.

The defendant's original three-day detention expired on Friday, September 24, 2004, and Ms. Lee did not sign an extension permitting the defendant's continued detention for an additional three days until Monday, September 27, 2004. The detention form Ms. Lee signed authorized the defendant's detention from September 22 to September 29, 2004.

Although she could not say for sure why she did not sign the form on Friday, Ms Lee testified that "by the time Friday (September 24, 2004) came I would have had a discussion with my supervisor to hold [the defendant] for an additional three days." (Tr. 24). Ms. Lee also testified as follows in response to defendant's counsel's questioning:

---

[2]Working days do not include weekends and holidays.

-22-

Q.  Nothing was signed by the close of business on Friday, right?  There's no extension by the close of business on Friday.
A.  Right, and there didn't need to be.

(Tr. 26-27).

The defendant claims that the DOC detained the defendant at the request of the FBI in an attempt to restrict the defendant's movements.  However, according to Ms. Lee, the information received from the FBI was one of several factors considered by the state in deciding to detain the defendant.  State officials considered the defendant's criminal history which included prior acts of violence, information from a confidential informant, the fact that President Bush would be in the area in a few days, as well as the FBI's report that the defendant had threatened to blow up federal buildings.

The evidence shows that the decision to detain the defendant for an additional three days was made by Ms. Lee with the approval of her supervisor prior to the expiration of the initial three-day detention order.  The defendant cites no authority for his apparent contention that the order of continued detention must be *signed* within the initial three days.  According, based on the evidence, the court concludes that the decision to extend the defendant's detention for an additional three days was made on September 24, 2004, by Ms. Lee and her supervisor, although the extension order was not signed until the following work day.

Moreover, the defendant lawfully would have remained in state custody even if an extension order had not been issued.  The defendant would have been placed in the halfway house following the initial three-day period of detention at the Rock County Jail.  Therefore, the court concludes that the defendant was lawfully detained pursuant to Wisconsin administrative regulations.

-23-

FBI Interrogation of the Defendant

The defendant maintains that because he was kept in custody illegally, any statement or physical evidence obtained from such illegality is subject to suppression. He asserts that his interrogation by the FBI and the statement he gave was a direct result of his illegal detention and must be suppressed.

In opposing the defendant's position, the government states that the defendant argues he was subject to an illegal arrest at the county jail, but fails to address why the State of Wisconsin could not have legally held him in custody in a halfway house and why such a distinction should taint his later statement to the FBI. In addition, the government maintains that regardless of the legality of the state detention, the defendant's statements after his lawful arrest on a federal warrant constituted a necessary break in any alleged illegality of state confinement. It asserts that the lawful federal arrest was a significant intervening circumstance, citing United States v. Reed, 349 F.3d 457, 463-66 (7th Cir. 2003).

The court has concluded that the state did not extend the defendant's detention illegally. He was in state custody at the time the FBI agents came to the Rock County Jail to interview him. The defendant does not dispute that he was read his Miranda rights and signed the waiver of rights form.

Moreover, regardless of the legality of the defendant's detention, the defendant's arrest on federal charges served as an intervening circumstance sufficient to dissipate any taint caused by the defendant's detention. It is well established that a confession obtained through custodial interrogation after an unlawful arrest "must be excluded from evidence unless the confession is attenuated enough from the illegal arrest that the confession is 'sufficiently an act of free will to purge the primary taint.'" Reed, 349 F.3d at 463 (quoting Brown v. Illinois,

-24-

422 U.S. 590, 602 [1975]) (other citations omitted). "The threshold requirement for admission is that the confession must have been voluntary for purposes of the Fifth Amendment." Reed, 349 F.3d at 463. The Supreme Court set forth four factors for determining whether a confession is unconstitutionally tainted by an illegal detention: 1) whether Miranda warnings were administered prior to the statement; 2) the time elapsed between the illegality and the statement; 2) the presence of intervening circumstances; 3) the purpose and flagrancy of the official misconduct. Brown, 422 U.S. 603-04; United States v. Green, 111 F.3d 515 (7th Cir. 1997). "In the final analysis, however, the question is still whether the evidence came from 'the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Green, 111 F.3d at 521 (quoting Wong Sun v. United States, 371 U.S. 471488 [1963]).

The defendant does not assert that his confession was involuntary, nor does he challenge the legality of the federal arrest warrant issued on September 29, 2004. The defendant was advised of his Miranda rights by the federal agents and acknowledged and waived those rights. However, in analysis of attenuation issues, the fact that the defendant was advised of his Miranda rights prior to making the statement is not itself dispositive. See United States v. Patino, 862 F.2d 128, 132 (7th Cir. 1988).

At the time the defendant gave his statement, he remained in state custody after his release from OCI on September 22, 2004. He gave his statement after being advised of his arrest on federal charges. Thus, in this case, there was a significant intervening circumstance – the defendant's arrest on federal criminal charges. Where a lawful arrest based on a warrant constitutes the "intervening circumstance," "it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated." Green, 111 F.3d at 522.

-25-

The purpose and flagrancy of the official misconduct factor of the <u>Brown</u> test "can only be aimed at exploring whether the police have exploited their illegal [conduct]." <u>United states v. Melendez-Garcia</u>, 28 F.3d 1046, 1055 (10th Cir. 1994). In this case, the arrest of the defendant arose from a separate investigation and was not an exploitation of illegal police conduct.

In sum, the court concludes that the defendant was lawfully detained pursuant to the applicable Wisconsin administrative regulations. Furthermore, even if the court were to conclude that the defendant had been illegally detained, the intervening circumstances dissipated any taint of the confession obtained. Accordingly, the court will recommend that the defendant's motion to suppress his statement be denied.

<u>Searches at 603 South Main Street and 1234 Marquette Street</u>

The defendant challenges the legitimacy of the searches and seizures at 603 South Main Street and 1234 Marquette Street in Janesville, Wisconsin. He asserts that the searches, which were based on third-party consent, were unlawful because the defendant had an expectation of privacy in his stored property. He maintains that there was a mutual understanding that the items would be kept until the defendant was able to retrieve them after completion of his criminal sentence. He states that each individual served "as a conservator or bailee of the property." (Defendant's Memorandum in Support of Motion to Suppress Statements and Physical Evidence [Defendant's Memorandum" at 6-7). The defendant further contends that the custodians did not have actual or apparent authority to consent to the searches and that the law enforcement officers did not engage in the proper inquiry to determine such authority.

-26-

In opposing the motion, the government asserts that the FBI agents obtained voluntary consent from both Ms. Williamson and Mr. Parr who were storing items for the defendant. The government points out that the defendant left his personal items with no instructions as to what Ms. Williamson should do with them and that she was never told she could not allow anyone to go through them.  Similarly, the government states that David Parr voluntarily turned over the items he was holding for his brother.  He also testified that he had thrown away a substantial part of the defendant's belongings and retained a box of other items in his home.  The government argues that, based on the circumstances, the agents reasonably believed that Ms. Williamson and Mr. Parr had actual or apparent authority to consent to the release of the defendant's belongings.

Although the Fourth Amendment protects against unreasonable searches and seizures, "warrantless searches are not *per se* unreasonable and are constitutional under the Fourth Amendment if 'an authorized individual voluntarily consents to the search.'" United States v. Grap, 403 F.3d 439, 443 (7th Cir. 2005) (quoting United States v. Duran, 957 F.2d 499, 501 [7th Cir. 1992]); see also, Florida v. Jimeno, 500 U.S. 248 (1991); Illinois v. Rodriguez, 497 U.S. 177, 186 (1990).  When a defendant allows a third party to exercise actual or apparent authority over the defendant's property, the defendant "is considered to have assumed the risk that the third party might permit access to others, including government agents."  United States v. Basinski, 226 F.3d 829, 833 (7th Cir. 2000) (citing United States v. Matlock, 415 U. S. 164, 171 n.7 [1974]).

Thus, a third party who has "actual or apparent authority over the defendant's property" has the authority to consent to a search.  Rodriguez, 497 U.S. at 181; Matlock, 415 U.S. at 177 n.14 (police may conduct warrantless search with consent of third party possessing

-27-

common authority or joint control over the premises); United States v. Basinski, 226 F.3d at 833.

"Common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" Rodriguez at 181-82 (citations omitted). Apparent authority can also provide a sufficient basis for consent. Id. at 188-89. To determine whether there is apparent authority, "one must look for indicia of actual authority." United States v. Rosario, 733, 737 (7th Cir. 1992) (quoting United States v. Miller, 800 F.2d 129, 134 [7th Cir. 1986]). To show consent based on apparent authority, "the government must show that a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched. Basinski, 226 F.3d at 834 (citing Rodriguez, 497 U. S. at 188).

Law enforcement authorities have "a duty to inquire further as to a third party's authority to consent to a search if the surrounding circumstances make that person's authority questionable." Montville v. Lewis, 87 F.3d 900, 903 (7th Cir. 1996); see also, Rodriguez, 497 U.S. at 188-89. However, if officers rely upon the consent of a third party whom the officers reasonably believe at the time they are acting has common authority over the premises, but who in fact does not possess such authority, they do not violate the Fourth Amendment. See Id. at 187; Basinski, 226 F.3d at 883. "When individuals possessing common authority over an area agree to permit an entry or search, their consent 'is valid against the absent, nonconsenting person with whom the authority is shared.'" United States v. Rosario, 962 F.2d at 736. The burden of establishing common or apparent authority rests upon the government. Id. at 181.

-28-

Consent searches are valid only if the consent was freely and voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). A person's knowledge of his right to refuse is not a prerequisite of a voluntary consent. Id. at 234. To determine the voluntariness of a consent, the court must inquire whether, under the totality of the circumstances, law enforcement officers have overborne the will of the person giving consent. See Haynes v. State of Washington, 373 U.S. 503, 513-14 (1963); Schneckloth, 412 U.S. at 226. The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. Grap, 403 F.3d at 443.

In this case, the court must determine whether Ms. Williamson and Mr. Parr had actual authority to consent to the search and seizure of the defendant's belongings or whether, based on the information available to the FBI agents, those agents could reasonably believe that Ms. Williamson and Mr. Parr had apparent authority to consent to such searches and seizures. With respect to Ms. Williamson, the evidence establishes that the defendant had lived with her and had left some belongings with her when he went to prison. The defendant never told Ms. Williamson that she should not allow anyone to go through his things, nor did he tell her what he wanted her to do with them, although apparently the defendant expected to return to Ms. Williamson's home upon his release from prison. Ms. Williamson kept some of the defendant's belongings in her bedroom closet and others were stored in boxes.

At the time of the interview with Ms. Williamson, the FBI agents were not aware that the defendant had left some belongings with her. Ms. Williamson volunteered this information to the agents and gave them permission to take the items. Although the defendant asserts that he had an expectation of privacy in his belongings, he voluntarily left his personal items with Ms. Williamson in her home and under her control. He gave her no specific instructions

-29-

as to what to do with the belongings. He did not tell her that she should not permit anyone to go through his things. Considering the totality of the circumstances, the evidence shows that Ms. Williamson had joint access or control of the defendant's personal items.

Regardless of whether Ms. Williamson had actual authority over the defendant's things, she had apparent authority to consent to their search. In <u>Rodriguez</u>, the Court affirmed the constitutionality of a warrantless entry based upon the consent by a third party whom the police, at the time of the search, reasonably believed to have common authority over the premises, even though the person in fact did not possess such authority. <u>See</u> 497 U.S. at 188-89. The factors to consider when making an objective determination of whether a person has apparent authority are by necessity the same factors that make up actual authority. <u>United States v. Miller</u>, 800 F.2d at 134.

In <u>Rodriguez</u>, the police had gained access to Rodriguez' apartment with the assistance of a woman who had described the apartment as "our[s], stated that she kept clothing and furniture at the apartment, unlocked the door with her key and granted the officers permission to enter." 497 U.S. at 180. On these facts, the Court found that the state had not established that the woman had "joint access or control for most purposes." <u>Id.</u> at 182. It held that her representations nonetheless furnished an adequate basis for the police to believe she had authority to permit the search of the apartment. <u>Id.</u> at 188-89.

In the instant case, there is no dispute that the defendant's belongings were located in Ms. Williamson's home. Ms. Williamson volunteered to the agents, who were there to interview her, that she had items in her home which belonged to the defendant. She also voluntarily told the agents that they could look at the items and take the belongings. Based on her representations, the agents had a reasonable basis to conclude that Ms. Williamson

-30-

had the authority to allow the search and seizure of the defendant's belongings. See Id. The undisputed facts demonstrate that, at the least, Ms. Williamson had apparent authority as to the defendant's belongs. None of the surrounding circumstances call into question Ms. Williamson's authority and, therefore, the agents did not have a duty to further inquire about her authority to consent to the search and seizure of items belonging to the defendant. See Montville, 87 F.3d at 903.

With respect to the items obtained from Mr. Parr, the defendant's brother, the evidence adduced at the hearing shows that Mr. Parr told the agents who came to interview him that he was storing items for his brother. He explained that he had cleaned out his brother's residence after a prior arrest and that he took four horse trailer loads of items that were at his brother's residence to the dump. After his brother's latest arrest, the defendant gave Mr. Parr some items for storage which, as in the past, Mr. Parr understood would be returned to his brother. Mr. Parr volunteered to give the items to the agents and Special Agent Molina said he would contact Mr. Parr to make arrangements to pick up the items.

Before pick-up arrangements could be made, Mr. Parr stopped two agents who were interviewing his neighbor and told them he would give them some of his brother's things. The agents went into Mr. Parr's home, looked through three boxes containing items belonging to the defendant and eventually took everything in one box, with the exception of the pornography.

Contrary to the defendant's contentions, the evidence establishes that Mr. Parr had common authority over his brother's belongings. The record is devoid of any evidence that the defendant placed any restrictions on access to his things or gave his brother any instructions as to their use or disposition. In fact, when Mr. Parr was interviewed, he told the

-31-

agents that on a prior occasion when he cleaned out his brother's residence at his request, he threw out four trailer loads of his brother's belongings.

Moreover, even if the court were to conclude that Mr. Parr did not have actual authority to consent to the search and seizure of his brother's things, he had apparent authority to consent to the search. See Rodriguez. As noted, to determine whether apparent authority exists, the court must look for indicia of actual authority. Rosario 962 F.2d at 737. Here, Mr. Parr stored items for his brother as he had done in the past. The record does not show that the defendant gave any directions to his brother about access to his belongings or placed any restrictions on access. Mr. Parr explained to the agents that he had stored items for his brother in the past and even disposed of some of the defendant's property, apparently without specific direction from the defendant. Based on the information before them, including the aura of authority exhibited by Mr. Parr, the officers could reasonably conclude that Mr. Parr had actual authority to turn over the defendant's belongings to them.

Regarding both Ms. Williamson and Mr. Parr, there is no evidence that the consent they gave arose from coercion or duress. Rather, based on the facts and the totality of the circumstances, the consents by Ms. Williamson and Mr. Parr were knowingly and voluntarily given. Thus, the court concludes that the searches and seizures conducted at 603 South Main Street and 1234 Marquette Street in Janesville, Wisconsin, are not subject to suppression. Accordingly, the court will recommend that the defendant's motion to suppress these searches and seizures be denied.

Search Warrant for the Defendant's Residence on July 21, 2001

The defendant maintains that certain items seized during the execution of a search warrant at his residence on July 21, 2001, – "The Anarchist Cookbook" and a writing tablet

-32-

containing written chemistry formulae – exceeded the scope of the warrant and should be suppressed.  The defendant contends that since the incriminating nature of the items was not immediately apparent, the  "plain view" doctrine is not applicable.  He further maintains that no reasonable officer could have determined that probable cause supported the belief that the items seized were linked to criminal activity.

The government asserts that "The Anarchist Cookbook" and the writing tablet were properly seized since they were evidence of the defendant's knowledge of marijuana and of drug dealing.  In addition, the government states these items could have been repositories for drug evidence.  Alternatively, the government contends that the items were properly seized under the "plain view" doctrine.

In this case, the search warrant authorized law enforcement officers to search for:

> Marijuana and other controlled substances, scales, packaging materials, drug paraphernalia, drug ledgers, address/phone records, indicia of occupancy, opened or unopened financial documents relating to drug proceeds, U. S. Currency and any and all instrumentalities, substances of documents which are in violation of Possession of Controlled Substances With Intent to Deliver/THC, contrary to Section 961.41(1m)(h) of Wisconsin Statutes.

Under the Fourth Amendment, search warrants are required to describe with particularity the items to be seized.  United States v. Buckley, 4 F.3d 552, 557 (7th Cir. 1993). However, the court of appeals for this circuit has observed that law enforcement officers executing a warrant are "required to interpret" the warrant and they are "not obliged to interpret it narrowly."  Hessel v. O'Hearn, 977 F.2d 299, 302 (7th Cir. 1992); see also, United States v. Stiver, 9 F.3d 298, 302 (3rd Cir. 1993).

In Stiver, the court held that the officers executing a search warrant for the defendant's apartment, automobile and person did not exceed their authority under the warrant by

-33-

answering the defendant's telephone and taking orders from his drug customers during the execution of the warrant. The search warrant authorized a search for "all drug paraphernalia" and "items to prove residency." 9 F.3d at 303. The court found that the officers had an entirely reasonable basis for concluding that the defendant's telephone fell within the definition of "drug paraphernalia." In addition, the court concluded that the officers' conduct was authorized by the portion of the warrant authorizing them to search for "[a]ny items to prove residency." Silver, 9 F.3d at 303.

In Hessel, 977 F.2d at 301, which involved an illegal gambling investigation, the search warrant authorized police officers "to seize illegal lottery tickets . . . 'money which (sic) is the fruit or has been used in the commission of a crime,' and 'documents that may constitute evidence of a crime.'" The appellate court upheld the trial court's decision that the defendants did not violate the plaintiffs' rights by seizing legal lottery tickets, an adding machine and containers holding small sums of cash. The plaintiffs in this civil rights action had contended that the seizure of these items went beyond the scope of the warrant. In rejecting the plaintiffs' contention, the court stated: "The defendants were entitled to rely on the warrant, which means they were required to interpret it. They were not required to interpret it narrowly and would have been mistaken to do so. . .." 977 F.2d at 302 (internal citations omitted).

The court emphasized, however, that "[t]here are limits to interpretation," noting that otherwise the constitutional requirement that a search warrant describe with particularity the items to be seized would be a nullity. Id. "Flagrant disregard for the terms of the warrant transforms it into a general warrant, which the Fourth Amendment forbids." Id. The court concluded that the facts failed to show a flagrant disregard for the warrant's terms and that, reasonably construed, the warrant covered all the items seized.

-34-

In this case, the officers observed "The Anarchist Cookbook" and writing tablet containing written formulae on a coffee table in the living room of the defendant's residence. The officers also observed bottles of chemicals, glass beakers and Bunsen burners. Under the terms of the warrant, the officers could inspect both the book and tablet. Officer Vaughn was familiar with "The Anarchist Cookbook" and had seen it during the execution of other search warrants. The book contains diagrams and directions on how to grow, care for and harvest marijuana, how to make LSD and how to make explosives and booby traps. It also contains recipes for the use and consumption of marijuana. <u>See</u> Exh. #8. Possession of "The Anarchist Cookbook" was not illegal.

Although Officer Vaughn could not specifically recall the reason the book was seized, he testified that law enforcement officers executing drug search warrants often look inside books and multi-page documents for money, drug ledgers or other items of evidence. He further explained that books are often seized during the execution of a warrant because they can provide evidence of occupancy of the residence. In this case, the officers had a reasonable basis for concluding that the book could provide "indicia of occupancy." As such it was subject to seizure under the warrant. Therefore, the court concludes that the officers' seizure of "The Anarchist Cookbook" was authorized by that portion of the warrant permitting a search and seizure of items showing "indicia of occupancy." <u>See</u> <u>Stiver</u>, 9 F.3d at 303.

Similarly, with respect to the notebook containing chemical formulae, given the nature of the search warrant, the officers could reasonably conclude that the writing tablet could constitute evidence of occupancy or qualify as drug paraphernalia. As such, it fell within the scope of the documents authorized to be seized under the warrant.

-35-

Finally, law enforcement officers are not required to construe a warrant narrowly. Hessell, 977 F.2d at 302. In fact, as the court noted, the officers in that case "would have been mistaken to do so." Id. Here, there is no evidence that the officers flagrantly disregarded the terms of the warrant in seizing "The Anarchist Cookbook" and the writing tablet. Reasonably construed, the warrant in this case covers all the items seized.

Since the court concludes that the "The Anarchist Cookbook" and the writing tablet containing chemical formulae were properly seized under the warrant, the court need not address the government's alternative argument that the items were subject to seizure under the plain view doctrine.

In sum, based on the testimony presented at the hearing, the court finds that the officers did not exceed the scope of the search warrant when conducting the search of the defendant's residence. "The Anarchist Cookbook" and the writing tablet containing chemical formulae are not subject to suppression. Therefore, this court will recommend that the defendant's motion to suppress the seizure of "The Anarchist Cookbook" and the writing tablet be denied.

## **CONCLUSION**

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that the United States district judge enter an order **denying** the defendant's motion to suppress statements. (Docket #50).

**IT IS ALSO RECOMMENDED** that the United States district judge enter an order **denying** the defendant's motion to suppress evidence. (Docket #51).

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C) and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof

Case 1:04-cr-00235-WCG   Filed 02/08/06   Page 36 of 37   Document 100

may be filed within ten days of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of your right to appeal.

Dated at Milwaukee, Wisconsin, this ____ day of February, 2006.

BY THE COURT:

___s/ Patricia J. Gorence_____
PATRICIA J. GORENCE
United States Magistrate Judge